UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE-MEMPHIS DIVISION

Patrick Donlon, an individual,          2:12-cv-02384

    Plaintiff,

-vs-

Evolve Bank and Trust, a Tennessee Corporation, Tommy Taylor, an individual

    Defendants.

---

## COMPLAINT AND DEMAND FOR TRIAL BY JURY

Plaintiff complains against the Defendants as follows:

1. Plaintiff Donlon is an individual residing in the State of Colorado and is a citizen of that state.

2. Defendant Evolve Bank and Trust [Evolve] is a Tennessee Corporation with its principal corporate offices located Cordova, TN and its headquarters located in Memphis, TN and is a citizen of the State of Tennessee.

3. Evolve is both a bank and residential mortgage lender and mortgage broker [correspondent] with 26 branch offices conducting residential mortgage brokering services in approximately 12 states throughout the

1

United States. It is subject to the jurisdiction of the FHA and HUD and bound by HUD's Mortgage Guidelines and especially REV 4060.1 REV 2.

4. This court has jurisdiction over the parties by virtue of the diversity of their citizenship pursuant to 28 USC Section 1332.

5. This court has subject matter jurisdiction over the dispute because the claim seeks money damages in excess of $75,000.00 and the claims also involve or are based upon the violation of various Federal laws and statutes including HUD and FHA regulations as to mortgage branch operations.

6. This court is a proper venue within which to bring this action based on the venue selection provision contained in the contract of employment between Evolve and Donlon. See Exhibit 1, Employment agreement.

## COMMON ALLEGATIONS

7. In 2009, Evolve recruited Donlon, an experienced and successful mortgage broker, to leave his current broker/employer and come to work for Evolve and establish a residential mortgage branch office under the Evolve name in Colorado.

8. Donlon's book of business [his lending/investing and customer contacts] was well developed and was valued in excess of 5 million

dollars. This was one of the reasons Evolve recruited Donlon [the value of his book of business or customer contacts].

9. Taylor recruited Donlon for Evolve and explained that not only would Donlon be able to bring his entire operation over to Evolve but that because Evolve was also a bank that Donlon would be able to write loan applications and conduct business in all 50 states, thereby expanding his operations even further.

10. Based on the representations by Taylor as to transferring his entire operation including staff and the ability to conduct residential mortgage loan operations in all 50 states, Donlon agreed to convert his operation to an Evolve branch office.

11. In converting his operations to Evolve, Donlon was required to sign an employment agreement [Exhibit 1], as well as separate restricted account agreement and a separate Branch Manager Compensation Agreement. See Exhibits 2 & 3.

12. Donlon executed the agreements presented to him by Evolve and in reliance on Evolve's claims that it operated lawfully and in full compliance with HUD and FHA regulations and that he could transfer his entire staff and being operating in all 50 states, began transferring his operation to Evolve.

13. Unbeknownst to Donlon, Evolve had adopted the highly profitable but illegal mortgage broker branch office system that violated HUD and FHA guidelines and regulations by placing the risk of loss due to operating expenses on Donlon in his role of branch manager instead of on Evolve where HUD and the FHA required the risk to remain.

14. In furtherance of Evolve's illegal branch operations, it required Donlon to establish and maintain a "professional office" and indemnify Evolve for the cost of establishing the professional office to the extent branch income did not exceed branch operating expenses.

15. In further violation of HUD and FHA regulations, Evolve required Donlon to advance the costs of the new office construction by wire transferring Evolve over $70,000.00, approximately $10,000 of which was used to pay for office construction and build out expenses and the balance as an illegal "reserve" against losses incurred by Evolve for operating the branch. See Exhibit 4, original wire transfer from Donlon to Evolve.

16. Evolve paid some of the construction and build out expenses directly from the illegal fund created by Evolve from Donlon's funds to make it appear that Evolve was in compliance with HUD and FHA regulations in the event of an audit. After using the balance of the

funds to cover operating losses and operating expenses, Evolve charged Donlon another $300,000 in costs associated with the construction of the office and branch operational losses which were deducted from the restricted account by Evolve to cover branch operating losses on a monthly basis, which according to the employment agreement were direct obligations of Evolve. See paragraphs 11 and 12 of June 2009 Employment Agreement.

17. Evolve's conduct was and is in violation of explicit HUD regulations regarding branch office expenses which require the broker to be directly responsible for operating losses, lease costs and all office build out costs and directly prohibit Evolve from making the branch manager financially responsible. See HUD Reg. 4060.1 REV-2, including prohibited branch practices, Exhibits 5.

18. Evolve's employment agreement with Donlon professed to comply with HUD regulations but in fact expressly violated them by placing the true financial burden for operational costs and expenses on Donlon as the branch manager. This violation of HUD regulations was and is contained in the Restricted Account Agreement. This agreement acted as an indemnity agreement as to all operating expenses to the extent of a monthly operational loss and even asserted a priority over Plaintiff

receiving any compensation [i.e. the $25,000 had to be replenished to before Plaintiff could be paid what he had earned]. Presumably, the separate agreement was not included in the employment agreement in order to avoid detection on HUD audit.

19. Donlon paid all the money Evolve demanded, including replenishing the restricted account every month that monthly operational losses exceeded income [this was in excess of $300,000].

20. Donlon also expended money on mortgage broker operations in many other states in anticipation of writing loans in all 50 states as promised by Evolve, but Evolve declined to support the operations financially and administratively and failed to file the appropriate applications for licenses in all 50 states. Evolve also began to cherry pick the very best loans to invest and approve, denying loan approval for many applicants who met HUD, FHA and even Evolve underwriting standards, making it impossible for Donlon to operate successfully.

21. Evolve continued to require Donlon to pay all operating expenses when branch operating costs exceeded income in violation of HUD standards and its own branch certification per the applicable 92001-B form submitted to HUD for the branch. Expenses for copiers, phones and phone systems, computers, for professional services for lawsuits

and claims against Evolve, were all charged directly to Donlon in violation of HUD Reg. 4060.1 REV-2.

22. Evolve ordered Donlon not to submit his expenses that Evolve was required to pay or reimburse until the branch was earning profits so that the operation would show profits and the expenses paid from the operations instead of by Evolve.

23. Due to conditions in the mortgage market and Evolve's business decisions, the branch operated by Donlon was not profitable and he could not submit his expenses for reimbursement to Evolve per its directive.

24. In early 2011, Evolve terminated the employment of Donlon. At the time of termination, Evolve owed Donlon over $450,000 in operational expenses associated with establishing the professional office and funding branch operations [losses] through the restricted account agreement.

25. Donlon's sudden termination also made it impossible for him to transition his operation to another broker and caused the loss of his entire book of business.

26. Donlon has requested that he be reimbursed his expenses in conformity with HUD regulations and consistent with his employment

contract, but Evolve has failed and refused to reimburse him for operational expenses and branch operational losses paid by Donlon through the restricted account agreement for Evolve.

## COUNT I

## BREACH OF CONTRACT

28. Donlon and Evolve entered into a series of agreements concerning the transfer of Donlon's mortgage brokerage business to Evolve.

29. The agreements include: an employment agreement; a compensation agreement; a Restricted Account Agreement and an expense reimbursement agreement.

30. Pursuant to the employment agreement, Donlon was required to establish and maintain a "professional office" under the Evolve name (a branch office) and Evolve was required to pay all branch operating expenses including rent.

31. Through the combination of the various agreements, Evolve required Donlon to personally pay for the office build out and construction while at the same time the agreements provided they were to comply with all applicable regulations including those issues by HID as to

branch operating expenses, requiring the broker to be liable for all such expenses.

32. Evolve's combination of agreements are ambiguous, and while claiming they comply with applicable HUD regulations, they actually violate those regulations by requiring Donlon to pay for Evolve's financial obligations or indemnify Evolve for operational expenses.

33. Assuming Evolve intended to comply with HUD regulations, the contract required Evolve to pay for all office build out expenses and all operation expenses. Moreover, the Restricted Account Agreement [aka the "buffer" agreement] is a per se violation of HUD prohibited branch practices.

34. Evolve's cocktail of agreements reversed its fundamental financial obligation to HUD as a mortgage branch obligation and to Donlon by mandating that Donlon pay these expenses and seek reimbursement.

35. The cocktail of agreements then provides that Donlon may only seek reimbursement of certain expenses as opposed to all operating expenses, in violation of HUD regulations.

36. Evolve breached the various agreements between it and Donlon by requiring that Donlon illegally pay for operational expenses of the

branch and then limiting reimbursement of expenses that Donlon should not have paid in the first place.

37. As a direct and proximate result, Donlon has incurred expenses made for the benefit of Evolve in violation of the legal requirements of his employment agreement in excess of $450,000.

38. As a direct and proximate result of Evolve's refusal to reimburse him for these expenses, Donlon has sustained economic damages in the minimum amount of $450,000 for branch operating expenses that are the responsibility of Evolve.

WHEREFORE, Donlon prays for judgment in his favor and against Evolve in the amount of his unreimbursed expenses and requests an accounting to determine the extent of those illegally incurred and unreimbursed expenses.

## COUNT II

## DETRIMENTAL RELIANCE

39. Donlon detrimentally relied on the representations of Taylor and Evolve as to Nation Wide mortgage operations, HUD and FHA legal compliance and the transfer of his entire staff in transferring his operations to form an Evolve branch office.

40. Had Donlon not relied to his detriment on Evolve's representations, he would have remained with his existing mortgage operation, conducting its mortgage broker operations lawfully, avoiding expending over $450, 000 to establish and maintain a new branch office for Evolve and would have maintained the value of his book of business.

41. As a direct and proximate result of the misrepresentations made by Evolve which Donlon relied on to his detriment, Donlon has incurred over $450,000 in expenses that he is unable to repay and the loss of his mortgage brokering operation and its value.

42. As a further direct and proximate result, Donlon lost and Evolve converted Donlon's book of business [mortgage loan customers] and destroyed his mortgage brokerage business, valued in excess of 5 million dollars by Evolve when Donlon was solicited by Evolve.

WHEREFORE, Donlon prays for judgment in his favor and against Evolve to compensate him for the unpaid and unreimbursed expenses and the loss of the value of his business.

## COUNT III

### FRAUD AND VIOLATION OF HUD REGULATIONS

43. Evolve assured Donlon through its branch specific 92001 B certification to HUD that it was FHA and HUD compliant.

44. Donlon relied on Evolve's representations as intended by Evolve and transferred his mortgage operations to Evolve.

45. Contrary to those representations, Evolve had created a scheme to circumvent the HUD and FHA regulations based on the illegal model using a separate Employment Agreement providing for payment of operational expenses by Evolve and another agreement requiring Donlon to indemnify Evolve for all operational costs in excess of branch income on a monthly basis.

46. Through a series of agreements, Evolve required Donlon to pay for the establishment of its branch office including the office rent, the build out and all operating expenses.

47. Evolve's model established complete branch operating expense indemnity for Evolve in violation of HUD Reg 4060.1 REV-2 and other HUD regulations and in violation of Evolve's own branch certification to HUD pursuant to its 92001-B.

48. As a direct and proximate result of Evolve's fraud, Donlon was forced to pay operating expenses for Evolve illegally and then caused to

suffer the loss of his business when Evolve refused to reimburse these expenses until the branch was profitable.

WHEREFORE, Donlon prays for judgment in his favor and against Evolve to compensate him for the unpaid and unreimbursed expenses and the loss of the value of his business.

## COUNT IV

## PUNITIVE DAMAGES

49. Evolve's conduct was deceitful, illegal and done with the intent to violate HUD and FHA restrictions on placing the risk of branch operating expenses on branch managers.
50. Evolve undertook its scheme to make it appear it was in compliance with HUD regulations while secretly and deceitfully using other agreements requiring its branch managers to pay for all monthly operating expenses that exceeded the branch's monthly income.
51. Evolve knew that this was a violation of HUD prohibited branch practice guidelines but implemented its scheme to place the risks associated with operating a branch office upon its branch managers while making it appear that it was in compliance through its Employment Agreements.

52. Evolves illegal, fraudulent and deceitful conduct caused substantial economic harm to Donlon, including the loss of his valuable book of mortgage business.

53. As a direct and proximate result, Donlon is entitled to an award of punitive damages to deter Evolve and other mortgage brokers from these illegal and oppressive practices.

WHEREFORE, Donlon prays for judgment in his favor and against Evolve in the amount of the unreimbursed expenses, the value of the destroyed brokerage operation and emotional pain and suffering including humiliation, embarrassment and damage to his reputation and an award of punitive damages to deter Evolve from its illegal and oppressive actions, together with an award of costs and attorney's fees.

Respectfully Submitted,

/s/ *[signature]*

Joseph C Bird

5/22/2012

## JURY DEMAND

Plaintiff demands a trial by a jury.

Respectfully,

/s/ *[signature]*

Joseph C Bird

5/22/2012