IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE

PATRICK DONLON

v.       Civil No. JFM-12-2384

EVOLVE BANK AND TRUST

******

**MEMORANDUM**

Plaintiff Patrick Donlon ("Donlon") brings this suit against defendant Evolve Bank & Trust ("Evolve"), his former employer, for alleged breach of contract, breach of the FHA Title II Mortgagee Approval Handbook ("Handbook") and Housing and Urban Development ("HUD") Guidelines, promissory estoppel, and fraud.[1]  Dir. No. 4060.1 REV–2 (Aug. 14, 2006).  Evolve now moves for summary judgment.  The parties have fully briefed the issues and no oral argument is necessary.  For the reasons set forth below, the motion will be granted in part and denied in part.

**BACKGROUND**

Donlon is the former manager of an independent mortgage brokerage in Colorado. Following the economic downturn in 2008 and 2009, Donlon sought to affiliate with a larger bank to sustain his business operations.  As part of this process, Donlon approached Evolve, an Arkansas-based bank that was expanding its branch network and establishing Loan Production Offices ("LPOs") across the country.  After successful negotiations between Donlon and Evolve's vice-president, Tommy Taylor, Evolve retained Donlon to manage its Colorado-based

---

[1] In his response to Evolve's motion for summary judgment, Donlon appears to abandon the remaining causes of action initially asserted in his second amended complaint.

1

LPO. According to Donlon, during these preliminary negotiations, Taylor obscured aspects of Evolve's lending capabilities and misrepresented the nature of its prospective partnership agreements. Donlon sought a bank with a substantial "FHA footprint" and the ability to write more than conventional, nongovernment-insured loans. Because Taylor allegedly assured him that Evolve could write FHA, government-insured loans in all fifty states, Donlon pursued an affiliation with Evolve over opportunities with other banks. Donlon further claims that after he verbally committed to Evolve, Taylor authorized him to initiate branch operations, leading him to incur costs for software, internet, and the solicitation of out-of-state FHA loans.

Donlon and Evolve ultimately signed three contracts on November 10, 2009: a Loan Production Office Manager Agreement (the "Employment Agreement"), a Branch Manager Compensation Agreement (the "Compensation Agreement"), and a Restricted Account Agreement.

The relevant terms of the Employment Agreement obligated Evolve to: (1) bear the financial responsibility for all costs and actions necessary to the operation of the LPO, and (2) pay all LPO operating expenses from the LPO's operating account. (ECF No. 47-3). The Employment Agreement, along with the Branch Compensation Agreement, also established the terms for Donlon's compensation, which authorized him to retain the LPO's net profit. *Id.*; (ECF No. 47-4).

The Restricted Account Agreement, meanwhile, was a bone of contention from the beginning. It required Donlon to deposit $25,000 into a restricted account "in order to maintain a cushion for the operations of the branch" in months where the LPO's losses exceeded its income. (ECF No. 47-2). The agreement also stipulated that, "[a]fter a final accounting of branch

expenses, Bank will return to Branch Manager within 90 days of the termination of the Branch Agreement any funds including interest being held." *Id.*

After inquiring elsewhere about the prevalence of similar agreements, Donlon allegedly objected to the required $25,000 deposit and expressed his general misgivings to Taylor—namely, that: (1) it was illegal for a branch manager to personally pay his LPO's operating expenses, and (2) the Restricted Account Agreement permitted Evolve to use Donlon's "cushion" to reimburse itself for branch expenses in months where the LPO was unprofitable. (Donlon Dep. 42: 22–23; ECF No. 48-5). In response to these concerns, Taylor allegedly told Donlon "not to worry about it" since the branch's projected profits would exceed $25,000 in the first month. (Donlon Dep. 43: 23–25, 44: 1–3; ECF: 48-5). Donlon signed the agreement and deposited $25,000 in the account.

Unhappily, Donlon's LPO failed to meet these favorable projections and over the next eighteen months, the branch consistently underperformed. Evolve did not have FHA lending in all fifty states, and Donlon maintains this limitation cost his branch $4.3 million in expected revenue. Additionally, Donlon contends that Evolve repeatedly refused to reimburse him for various branch expenses—including, but not limited to, the marketing and appraisal costs he incurred to solicit out-of-state loans before he knew the true extent of Evolve's FHA footprint. Although Evolve disputes this claim—maintaining that it reimbursed, in full, all invoices submitted by Donlon's LPO—Donlon argues that these invoices are misleading. According to Donlon, Taylor regularly called him following the submission of an expense report and required him to resubmit a lower amount that did not fully reflect the branch's true costs. (Donlon Dep. 98: 15–18; ECF No. 48-5). As a result, Donlon claims that he is entitled to roughly $180,000 in unreimbursed expenses.

3

Meanwhile, during the LPO's initial period of unprofitability, Evolve drained the restricted account's $25,000 balance and required Donlon to deposit an additional $25,000. When the LPO continued to struggle, Donlon agreed to pay a final $20,000 to avoid termination of the branch in October 2010. Apart from these payments, Evolve compensated Donlon approximately $92,000 during his tenure.

Eighteen months after their original agreement was signed, Evolve fired Donlon on March 1, 2011. Because Donlon believed Evolve owed him unreimbursed expenses and had improperly deducted costs from the LPO's operating account, Evolve's efforts to settle the account failed. Donlon also rejected Evolve's offer to pay him the remaining $8,000 in the restricted account, instead seeking the full $70,000 he deposited over the course of his employment. Unable to resolve these discrepancies, Donlon filed suit on May 22, 2 012.

**STANDARD**

Summary judgment is appropriate when the record shows there is no genuine issue as to any material fact and the movant is entitled to relief as a matter of law. Fed. R. Civ. P 56(a); *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When reviewing a motion for summary judgment, the court must look at the facts and inferences drawn there from in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

Although the moving party bears the burden to demonstrate the absence of any genuine issue of material fact, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970), the non-moving party may not merely rest upon allegations or denials in pleadings, but must, by affidavit or other evidentiary showing, set out specific facts showing a genuine issue remains for trial. Fed. R.

4

Civ. P. 56(c)(1)(A). A court should enter summary judgment where a non-moving party fails to make a sufficient showing to establish the elements essential to the party's claim and on which the party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322.

If there is insufficient evidence for a reasonable jury to render a verdict in favor of the non-moving party, there is no genuine issue of material fact, and summary judgment may be granted. *See Anderson*, 477 U.S. at 248. Conversely, the motion should be denied if factual issues exist "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

## ANALYSIS

### I. Count I: Breach of Contract

The parties do not dispute that Tennessee law governs the above claims. Under Tennessee law, a plaintiff alleging a breach of contract must prove three elements: (1) the existence of a contract, (2) nonperformance amounting to a breach of that contract, and (3) damages caused by the breach of the contract. *Life Care Centers of America, Inc. v. Charles Town Associates Ltd. Partnership,* 79 F.3d 496, 514 (6th Cir. 1996). The parties agree that three contracts exist: the Employment Agreement, the Branch Compensation Agreement, and the Restricted Account Agreement. Donlon's Second Amended Complaint, along with his Response to Defendant's Motion for Summary Judgment, alleges that Evolve breached multiple provisions of these agreements.

First, Donlon claims that Evolve breached the Employment Agreement by failing to reimburse Donlon for all branch-related expenses and by improperly deducting other costs from the LPO's operating account. He also contends that the Employment Agreement incorporates various provisions of the HUD Handbook's rules for mortgagees, and that Evolve breached these

5

implied contract terms by using the funds in the restricted account to pay operating costs. In the alternative, Donlon argues that the Restricted Account Agreement incorporates the HUD Handbook and that the Agreement therefore requires Evolve to reimburse Donlon for the full amount he deposited in the account. According to Donlon, Evolve thus breached the Restricted Account Agreement by refusing to repay Donlon the $70,000 he contributed over the course of his employment. The court will address each of these alleged breaches in turn.

### A. *The Employment Agreement*

#### 1. *Reimbursement of LPO Operating Costs*

Although Donlon contends that Evolve breached the Employment Agreement by paying less than half of the costs incurred by the LPO during its eighteen months as a branch, Evolve points to its undisputed reimbursement of the expense invoices that Donlon presented in discovery. According to Evolve, Donlon has thus failed to demonstrate a genuine issue of material fact regarding Evolve's alleged breach of the Employment Agreement. I disagree.

Section I.A.11 of the Agreement sets out Evolve's responsibilities with respect to the LPO's operating expenses. (ECF No. 47-3 at 2). The Agreement states in relevant part:

> Employer will bear all financial and contractual responsibility for all costs and actions necessary to the operation of the LPO through LPO operating practices . . . . LPO operating expenses will be paid directly by Employer. These costs will be deducted from the LPO operating account and / or profit center for this specific location.

*Id.* A later section, Section II.2(5) underscores this point, providing:

> All expenses associated with the LPO will be paid out of the LPO's operating account unless otherwise stated in writing by the Employer.

*Id.* at 6. Evolve does not dispute that it was required to pay the LPO's operating costs, but argues it did not breach this obligation because it reimbursed, in full, all of the invoices Donlon

6

submitted over the course of his employment. To support this claim, Evolve points to its full reimbursement of fourteen invoices compiled by Donlon—the only invoices provided by either party—totaling $100, 747.87. (ECF No. 41-5).

In response, Donlon submitted a comprehensive, itemized record of his LPO's documented "Profit & Loss Detail" from August 2009 through May 2011. (ECF No. 47-8). According to this report, the LPO's total operating costs during this period amounted to $276,499.11. *Id.* Although Evolve's invoices demonstrate that it reimbursed Donlon for $100,747.87 of this amount, Donlon argues that it failed to pay the remaining $175,751.24. Evolve has not contested the figures in the Profit & Loss Detail, other than to reiterate that Donlon only produced fourteen requests for reimbursement.

Donlon, however, asserts that Taylor regularly pressured him to doctor his original expense reports and to submit lower amounts that did not accurately reflect the LPO's actual costs. Specifically, in his sworn deposition, Donlon contends Taylor told him, "[T]ake some of those [expenses] off there and submit it for [less] because we are not going to pay you the additional right now. As profits are increased, we will allow you to resubmit expenses." (Donlon Dep. 97: 7–11; ECF No. 48-5). According to Donlon, not only was he never permitted to resubmit those costs, but Taylor followed this pattern on multiple occasions:

> "I would submit my expenses and then he would call me . . .and say, 'take this, lower the amount,' and so then I never kept the original [invoice] that I had submitted to him …."

(Donlon Dep. 98: 15–18; ECF No. 48-5). Donlon thus asserts that the fourteen invoices are an inaccurate depiction of the LPO's expenses. Donlon also points to at least one email, which, he alleges, preceded one of the Taylor phone calls of this nature. (Donlon Dep. 98: 11–18; ECF No. 48-5; ECF No. 41-7).

7

Through these submissions—principally, Donlon's Profit & Loss Detail and sworn deposition statements—Donlon has produced sufficient evidence that, if proved, establishes a genuine issue of material fact as to whether Evolve failed to cover all necessary operating costs. Although Evolve contends that some of the items on the Profit & Loss Detail were not related to branch operations, the bank has not adequately accounted for the discrepancies between the Profit & Loss Detail and the amount Evolve reimbursed. Nor has it responded to Donlon's deposition testimony, except to attack the probative value of Taylor's email. To be sure, Evolve is free to dispute Donlon's credibility, or contest the proper weight given to the Profit & Loss Detail at trial. Credibility determinations and the weighing of evidence, however, are not functions for the court on a motion for summary judgment. *Anderson,* 477 U.S. at 255. Viewing the evidence in the light most favorable to the plaintiff, Donlon has stated a genuine issue of fact regarding his contention that Evolve breached Section I.A.11 of the Employment Agreement. Summary judgment on this issue, therefore, is denied.

> 2. *Use of the Restricted Account Funds and the Incorporation of HUD Handbook Provisions for Mortgagees*

According to Donlon, the Employment Contract also incorporates the terms of the Housing and Urban Development's FHA Title II Mortgagee Approval Handbook, Dir. No. 4060.1 REV–2 (Aug. 14, 2006), which, he alleges, forbids banks from withdrawing funds from a restricted account in order to cover branch operating expenses. *Id*. ¶¶ 2–8, 2–14. Because Evolve purportedly used Donlon's $70,000 deposit to pay parts of the LPO's costs, Donlon maintains the bank breached the implied terms of the Employment Agreement. As Evolve correctly points out, however, the Employment Agreement does not reference any portion of the HUD Handbook. (ECF No. 47-3). Because Donlon has not suggested any specific provision of the Agreement that Evolve may have violated with respect to its alleged breach of the HUD

8

guidelines, the court agrees with Evolve that Donlon has failed to sustain his breach of contract claim on this theory.

Drafted to enforce portions of the Fair Housing Act, HUD regulations "govern the relationship between mortgagees and the government . . . ." *Baker v. Countrywide Home Loans, Inc.*, No. 3:08-CV-0916-B 2009 WL 1810336, at *5 (N.D. Tex. June 24, 2009). That said, the Handbook prohibits a branch compensation plan or employment agreement that requires a branch manager to: (1) pay branch operating expenses; (2) indemnify the FHA-approved mortgagee if it incurs damages from any apparent, express, or implied agency representation by or through the branch's actions; or (3) issue a personal check to cover operating expenses if funds are not available from an operating account. FHA Handbook ¶ 2–14(B).

Here, Donlon alleges that Evolve used the money in the restricted account to pay branch operating costs in months where the LPO's losses exceeded its income. Because Donlon funded the restricted account with personal checks, he argues that the Restricted Account Agreement effectively forced him to pay branch operating expenses in contravention of both the HUD guidelines and the Employment Agreement.

Evolve, however, argues that even if the bank's practice breached the HUD Handbook, a violation of the HUD regulations does not support either a private right of action or a breach of contract claim. Evolve is certainly correct as to the first point—as several courts have observed, the HUD Handbook does not create a private right of action. *See, e.g.*, *M.B. Guran Co. v. City of Akron,* 546 F.2d 201, 204 (6th Cir. 1976) (concluding that the HUD regulations create neither an express nor implied private right of action); *see also Burrough v. Hills,* 741 F.2d 1525, 1531–32 (7th Cir. 1984) ("Efforts to enforce implied causes of action under the National Housing Legislation or the HUD Handbook have frequently come under consideration of appellate courts,

and have always failed."); *Roberts v. Cameron-Brown Co.*, 556 F.2d 356, 360 (5th Cir. 1977). Still, although the HUD regulations do not themselves create a private right of action, a violation of the Handbook may sustain a breach of contract claim where a final agreement expressly incorporates the Handbook's various terms. *See Hernandez v. Home Savings Assoc. of Dallas*, 606 F.2d 596, 601 (5th Cir. 1979) (holding that HUD regulations explicitly incorporated into mortgage documents became provisions of the agreement); *see also Bassie v. Bank of Am., N.A.*, No. 4:12-CV-00891, 2012 WL 6530482, at *4 (S.D. Tex. December 13, 2012); *Baker v. Countrywide Home Loans, Inc.*, WL 1810336, at *5.

In this instance, the Employment Agreement contains no reference to the HUD regulations, nor does it include language copied from the Handbook. (ECF No. 47-3). In fact, a thorough reading of the Agreement reveals no suggestion that Evolve intended to be bound by the terms of the Handbook—or, for that matter, by any government regulation at all. *Id.* Consequently, the Employment Agreement does not expressly incorporate the HUD guidelines. Indeed, Donlon testified that Taylor made no representations regarding Evolve's adherence to the HUD guidelines during the parties' initial negotiations. (Donlon Dep. 45: 20, 46: 1–5; ECF No. 41-1 at 18–20). Instead, Donlon points to the deposition testimony of Evolve's corporate representative, Sally Wood, who—according to Donlon—conceded that the HUD Handbook applies to the Employment Agreement. (Wood Dep. 73: 18–24; ECF No. 48-4). Even if this were correct—and Evolve disputes this characterization of Wood's testimony—Wood's deposition alone would be insufficient to demonstrate that the Employment Agreement incorporated the guidelines, where the language of the contract suggests otherwise. Courts have refused to find HUD regulations incorporated by implication, and this case provides no basis to hold otherwise. *See, e.g.*, *M.B. Guran Co.*, 546 F.2d at 204; *Bassie*, 2012 WL 6530482, at *4;

10

*see also Burrough v. Hills,* 741 F.2d at 1531–32; *Roberts v. Cameron-Brown Co.*, 556 F.2d at 360. Evolve's motion for summary judgment on this issue is granted.

### B. *The Restricted Account Agreement*

If the Employment Agreement does not incorporate the HUD regulations, however, Donlon argues that the Restricted Account Agreement does. According to Donlon, therefore, Evolve's use of his deposited funds constituted a breach. More precisely, Donlon urges the court to construe the Restricted Account Agreement in a way that: (1) aligns with the dictates of the HUD regulations, and (2) forbids Evolve's efforts to supplement the bank's operating budget with the funds in the account. However, because Evolve correctly identifies that: (1) the Restricted Account Agreement's express terms do not obligate Evolve to return the full amount of his deposit, and (2) Donlon's attempt to incorporate the HUD Handbook into a second agreement between the parties remains unavailing, Donlon's claim based on a breach of the Retricted Account Agreement fails as a matter of law.

Under Tennessee contract law, a court's goal in interpreting contracts is to ascertain the intention of the parties and give effect to that intention. *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 703–04 (Tenn. 2008). If the language of an agreement is clear and unambiguous, a court should follow its plain meaning. *Id*. at 704. To that extent, a court's interpretation "should be one that gives reasonable meaning to all of the provisions in the agreement, without rendering portions of it neutralized or without effect." *Id*. Where an agreement's terms are unambiguous, a court must enforce those terms, as a matter of law, "regardless of any inequity arising from that enforcement." *Pylant v. Spivey*, 174 S.W.3d 143, 152 (Tenn.Ct.App. 2003).

Moreover, although certain language may be open to more than one reasonable construction, a contract is not ambiguous simply because the parties posit different

interpretations of its provisions. *Johnson v. Johnson*, 37 S.W.3d 892, 896 (Tenn.2001). Rather, ambiguity arises only where the meaning is uncertain and may be fairly understood in more ways than one. *Id.* In determining whether terms are ambiguous, a court should take the contractual language in its plain, ordinary and popular sense. *See Maggart*, 259 S.W.3d at 703–04. A court will not pursue a strained construction of the language of an agreement to find ambiguity where none exists. *Farmers–Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn.1975).

Here, the Restricted Account Agreement is not ambiguous—it sanctions Evolve's use of the restricted account funds and it does not incorporate the HUD guidelines, expressly or otherwise. (ECF No. 47-2). Its relevant provisions read as follows.

> *1.* Bank and Branch Manager enter into this agreement to create a restricted account in the amount of $25,000 in order to maintain a cushion for the operations of the branch managed by the Branch Manager. Withdrawals from the account shall be limited to the specific terms below:
>
>> a. Withdrawals from the account shall be made when the monthly operating expenses of the branch are greater than the monthly profits generated.
>>> i. Operating expenses shall be defined as any cost related [to] the operation of the branch. .
>>
>> . . . .
>>
>> d. After a final accounting of branch expenses, Bank will return to Branch Manager within 90 days of the termination of Branch Agreement any funds including interest to be held.

*Id.* Because the Agreement allows Evolve to use the funds "as a cushion for the operations of the branch" where "operating expenses are greater than the monthly profits," it ostensibly permits the bank to use that money to pay operating costs. *Id.* Indeed, this appears to be the Agreement's primary purpose. Moreover, even if the parties intended to employ the funds in other ways—namely, as an accounting tool to measure branch profits and losses, and to assess manager compensation—the Agreement simply cannot be read to *prohibit* the payment of branch

12

operating costs from the restricted account, such that Evolve's practice would constitute a violation of the contract.

Although Donlon does not dispute this natural reading of the Agreement, he argues that, because the contract's ostensible meaning would violate the FHA Handbook ¶ 2–14(B), the court should construe it to forbid this use of the account money. Otherwise, he asserts, the court would condone a HUD violation, and in doing so, contravene Tennessee law suggesting that the plain meaning of the contractual language should apply only "if it does not conflict with any rule of law, good morals, or public policy." *Planters Gin Co. v. Federal Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002) (citations omitted). According to Donlon, a proper reading of the Agreement requires Evolve to return the full $70,000 "cushion" upon the termination of the branch.

As a practical matter, Donlon's interpretation would also require the court to substitute the word "all" for "any" in Section 1(d). (ECF No. 47-2). As it exists currently, by requiring Evolve to return "any" funds that remain in the restricted account following the LPO's termination, Section 1(d) both: (1) contemplates the possibility that the full amount of the initial deposit may no longer remain in the account upon termination, and (2) obligates Evolve only with respect to the remaining funds. *Id.* There is no requirement in Section 1(d)—or elsewhere in the Restricted Account Agreement—that Evolve must refund the full amount of Donlon's original deposit. *Id.* Donlon's preferred construction, therefore, would necessarily neutralize the effect of the existing section.

The court declines to rewrite the terms of the Agreement in this way. Donlon's proposed interpretation severely strains the document's plain meaning in order to find an uncertainty that does not exist. *See Pylant*, 174 S.W.3d at 151 (observing that courts should refrain from

rewriting agreements under the guise of interpreting them). The Agreement is not ambiguous, and absent ambiguity, the court is free to determine its meaning as a matter of law without recourse to extrinsic evidence. *See Maggart*, 259 S.W.3d at 703–04. As a result, the court need not consider Ms. Wood's deposition—to the extent that her statements support Donlon's preferred interpretation and suggest that the restricted account was intended to be used only as an accounting tool and not as cushion to cover branch operating costs—which Donlon again marshals in an attempt to redraw the parameters of what the Agreement deemed permissible. (Wood Dep. 61: 15–20; ECF No. 48-4).

Moreover, with his proposed interpretation of the Restricted Account Agreement, Donlon again seeks to incorporate the HUD regulations by implication into the terms of his contract with Evolve—something this court, in the related context of the Employment Agreement, has already refused to do. Indeed, courts have been reluctant to permit such attempts to circumvent the absence of a private right of action, where—as here—the agreement fails to explicitly incorporate the relevant regulatory provisions. *See St. Christopher Associates, L.P. v. United States*, 511 F.3d 1376, 1384 (Fed. Cir. 2008) (declining to find that the government's failure to comply with certain HUD regulations constituted a breach of contract where the agreement failed to explicitly incorporate the Handbook); *see also Buck v. American Airlines, Inc.*, 476 F.3d 29, 37 (1st Cir. 2007) (refusing to find that the applicable federal regulation could be enforced as an implicit contract term where the regulation itself created no implied private right of action). Donlon, meanwhile, cites no cases to support his argument. Because the Restricted Account Agreement does not incorporate the HUD guidelines—expressly or through implication— Donlon fails to state any basis for his breach of contract claim in this context. Summary judgment is therefore appropriate.

## II. Count II: Violation of HUD Regulations

Donlon also contends that he may recover directly, as a third-party beneficiary, for Evolve's alleged violation of the HUD Handbook. In response, Evolve argues that the HUD Handbook creates no private right of action. According to Donlon, however, the regulations do create a private right of action for branch managers, if not for mortgagors. As the court's discussion indicates *supra,* this theory fails as a matter of law.

As courts—including those in the Sixth Circuit—have concluded on numerous occasions, neither the FHA nor the accompanying HUD Handbook creates a private right of action for mortgagors. *See, e.g.*, *M.B. Guran Co.*, 546 F.2d at 204; *Bassie*, 2012 WL 6530482, at *4; *see also Burrough v. Hills,* 741 F.2d at 1531–32; *Roberts v. Cameron-Brown Co.*, 556 F.2d at 360. Rather, the HUD regulations govern the relationship between a mortgagee and the government—not the relationship between a mortgagee and mortgagor, or, for that matter, the relationship between a mortgagor and a prospective bank manager. *See generally id.* Consequently, a branch manager such as Donlon cannot seek to enforce the Handbook through a private right of action. As Evolve correctly notes, Donlon provides no authority to support his argument that branch managers—as distinguished from mortgagors—are the intended third party beneficiaries of the HUD guidelines. Summary judgment is therefore granted on Donlon's HUD violation claim.

## III. Count III: Detrimental Reliance

Donlon also seeks relief based on detrimental reliance, otherwise known as promissory estoppel. In Tennessee, promissory estoppel dictates that: "a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promise . . . and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Calabro v. Calabro*, 15 S.W.3d 873, 878 (Tenn. Ct. App. 1999) (citations

omitted). To establish a claim for promissory estoppel, a plaintiff must demonstrate: (1) that a promise was made; (2) that the promise was unambiguous and not unenforceably vague; and (3) that he reasonably relied on the promise to his detriment. *Chavez v. Broadway Elec. Service Corp.*, 245 S.W.3d 398, 404 (Tenn. Ct. App. 2007) (citations omitted).

Donlon maintains that he relied, to his detriment, on Taylor's representations of both Evolve's FHA "footprint" and the legality of the Restricted Account Agreement. Specifically, during the preliminary contract negotiations, Donlon avers Taylor assured him that Evolve could write FHA, government-insured loans in all fifty states. (Donlon Dep. 137: 15–25, 138: 1–24; ECF 48-5). Based on this promise, Donlon allegedly partnered with Evolve instead of contracting with another prospective bank. Although Taylor insists that he referenced only Evolve's ability to write conventional, non-government-insured loans, Donlon alleges that, after verbally committing to Evolve but before signing the final contracts, he relied on Taylor's representations to initiate FHA loans and incurred significant costs as a result. (Donlon Dep. 137: 4–9, 139: 4–15, 140: 6–12; ECF 48-5).

Donlon also contends that, during negotiations, he raised his concerns regarding the propriety and legality of the Restricted Account Agreement. In response, Taylor purportedly assured Donlon that the agreement was "on the up and up." (Donlon Dep. 236: 10-11; ECF No. 48-5). Although he did not expressly guarantee that the Restricted Account Agreement complied with the HUD Handbook, Taylor allegedly told Donlon not to worry, since the branch's expected profitability would mitigate the financial loss caused by the $25,000 deposit. (Donlon Dep. 43: 23–25, 44: 1–3; ECF: 48-5).

Even construing these factual allegations in the light most favorable to Donlon, Taylor's alleged representations do not support a claim for promissory estoppel. First, assuming Donlon

16

can demonstrate that both: (1) Taylor misrepresented the bank's ability to write FHA, government-insured loans in all fifty states, and (2) Donlon relied on these assurances to his financial detriment, there is nothing in the record to suggest that his reliance was reasonable. Instead, Taylor's verbal statements were blatantly contradicted by the applicable HUD regulations, of which Donlon was demonstrably aware. Specifically, Donlon emailed the HUD-issued Mortgagee Letter 2005-40—which limits each LPO's ability to write FHA loans to certain defined geographic "footprints"—to Taylor in 2009, in order to discuss whether FHA lending in all fifty states might be possible for the LPO in the future. (ECF No. 41-3 at 33–43). Because this provision directly refutes any alleged assurance that Evolve could write FHA loans on a nationwide basis, Donlon had actual notice of his LPO's true lending capabilities at the outset of the branch's operations in 2009. As a result, Donlon has failed to adequately establish an essential element of his promissory estoppel claim.

Likewise, Taylor's alleged statements regarding the legality of the Restricted Account Agreement do not provide a sufficient basis for Donlon's claim of detrimental reliance. Donlon concedes that he never discussed with Taylor whether the agreement complied with the relevant terms of the HUD Handbook, and acknowledges that Taylor made no specific commitments regarding the applicable federal regulations. (Donlon Dep. 45: 20, 46: 1–5; ECF No. 41-1 at 18–20). Instead, Donlon premises his claim for promissory estoppel on Taylor's alleged statements that: (1) the Agreement was on "the up and up", and (2) the LPO's expected profits would balance out the $25,000 deposit. (Donlon Dep. 236: 10-11; ECF No. 48-5). In addition to being unenforceably vague, however, Taylor's alleged assurances were not ones upon which Donlon could have reasonably relied.

First, Taylor's statement that the Restricted Account Agreement was "on the up and up" does not constitute an unambiguous promise calculated to induce reliance. Moreover, as Evolve points out, Donlon offers no evidence to suggest that he relied on Taylor's assertion about the Agreement's legality. (Donlon Dep. 46: 22–25, 47: 1–25; ECF No. 41-1 at 19–20). Rather, Donlon testified that he relied instead on Taylor's assurances that the LPO would generate a $25,000 profit in the first month. (Donlon Dep. 43: 24–25, 44: 1–3; ECF No. 48-5). It was not reasonable, however, for Donlon to rely on his prospective employer's generalized assertion about the LPO's likelihood for future success. One would not expect an employer to indicate to a prospective partner that his LPO was likely to operate unprofitably. Consequently, a reasonable jury could not find that Donlon reasonably relied on Taylor's alleged assurances regarding the agreement's legitimacy or the projected success of the LPO.

Summary judgment is therefore granted on this claim.

## IV. Count IV: Fraud

Lastly, Donlon seeks relief for Evolve's alleged fraud. In Tennessee, Donlon's claim for fraud or intentional misrepresentation requires that: (1) Taylor made a representation of an existing or past fact; (2) the representation was false when made; (3) the representation was in regard to a material fact; (4) Taylor made the false representation knowingly, without belief in its truth, or recklessly; (5) Donlon reasonably relied on the misrepresented, material fact; and (6), Donlon sustained damages as a result of the misrepresentation. *See Hodge v. Craig*, 382 S.W.3d 325, 343 (Tenn. 2012) (citations omitted).

To support his assertion that the bank committed fraud, Donlon argues that Taylor falsely portrayed Evolve's FHA lending capabilities and made untrue statements regarding the Restricted Account Agreement and Donlon's deposit. According to Donlon, Taylor knew these

representations to be false, but made them to induce Donlon to enter into a partnership with Evolve. Because he allegedly relied on these assurances, Donlon sustained damages in the form of forgoing other partnership opportunities and incurring substantial costs to solicit out-of-state loans.

As with his promissory estoppel claim, however, Donlon's failure to establish reasonable reliance proves fatal to his claim for fraud. Viewing the facts in the light most favorable to him, Donlon still cannot demonstrate that it was reasonable for him to rely on Taylor's statements, which he knew to be contradicted by the applicable federal regulations. Nor was it reasonable for him to rely on Taylor's vague assurances regarding the restricted account and the LPO's expected profitability. Consequently, Evolve's summary judgment motion is granted with respect to Donlon's claim for fraud.

## V. Count V: Punitive Damages

Additionally, Donlon argues that he is entitled to recover punitive damages on all of his claims. Donlon, however, does not allege that Evolve's failure to adequately reimburse him for the LPO's operating costs, as required by the terms of the Employment Agreement, involved elements of fraud, malice, gross negligence, or oppression. *See Medley v. A.W. Chesterton Co.*, 912 S.W.2d 748, 752–53 (Tenn. Ct. App. 1995) (observing an exception to the general rule that punitive damages are not proper in breach of contract cases for suits involving fraud). Donlon, therefore, has failed to establish that he is entitled to recover punitive damages for his sole surviving breach of contract claim. Because summary judgment is granted on the remaining counts in Donlon's Second Amended Complaint, Donlon cannot recover punitive damages.

## CONCLUSION

For the aforementioned reasons, Evolve's motion for summary judgment is granted with respect to Counts I (in part), II, III, IV, V, and VI; and is denied, in part, with respect to Count I. A separate order follows.


 03/31/2014                                             /s/ J. Frederick Motz
Date                                                    J. Frederick Motz
                                                         United States District Judge